# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

BANK RHODE ISLAND,
Appellant-Creditor,

vs.

PAWTUXET VALLEY PRESCRIPTION & SURGICAL CENTER, INC.,
Appellee-Debtor.

**C.A. No. 07-390S**

ON APPEAL FROM AN ORDER OF THE
UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF RHODE ISLAND
(BK. No. 07-1767; Chapter 11)

---

REPLY BRIEF OF APPELLANT-CREDITOR
BANK RHODE ISLAND

---

Robert D. Wieck, Esq. (#1739)
Attorney Denean M. Russo (#5043)
Counsel for Plaintiff-Appellant
MacADAMS WIECK DeLUCA & GEMMA, INC.
101 Dyer Street, Suite 400
Providence, RI 02903
Telephone (401) 454-8700
Fax (401) 454-8755

Date: January 22, 2008

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ..........iii

I. INTRODUCTION ..........1

II. ARGUMENTS IN REPLY ..........1

A. THE BANKRUPTCY COURT'S CASH COLLATERAL ORDER WAS CLEARLY ERRONEOUS ON THE GROUND THAT IT WAS BASED UPON THE FAIR MARKET VALUE OF THE SANDY BOTTOM PROPERTY RATHER THAN THE APPROPRIATE LIQUIDATION VALUE ..........1

B. EVEN ASSUMING, *ARGUENDO*, THAT THE BANKRUPTCY COURT'S VALUATION STANDARDS WERE PROPERLY APPLIED TO THE DEBTOR'S ASSETS AND AN "EQUITY CUSHION" EXISTS, THE BANKRUPTCY COURT'S CASH COLLATERAL ORDER WAS STILL ERRONEOUS IN ITS DETERMINATION THAT BECAUSE THE BANK HAD AN EQUITY CUSHION IN THE STATIC, HARD COLLATERAL ASSETS OF THE DEBTOR, IT WAS NOT NECESSARY FOR THE BANKRUPTCY COURT TO ADDRESS OR CONSIDER THE ISSUE OF THE FURTURE STABILITY OF THE SOFT ACCOUNTS RECEIVABLE COLLATERAL ASSETS ..........4

III. CONCLUSION ..........9

# TABLE OF AUTHORITIES

CASES PAGE

*Baybank Middlesex v. Ralar Distributors, Inc.*, 69 F.3d 1200 (1st Cir. 1995) .......................8

*In re Aegean Fare, Inc.*, 33 B.R. 745 (Bankr.D.Mass. 1983) ........................................8

*In re Byers*, 304 B.R. 1 (1st Cir. BAP 2004) ...............................................................4

*In re Dynaco Corporation*, 162 B.R. 389 (Bankr.D.N.H. 1993) ..................................4, 5-6

*In re Lane*, 108 B.R. 6 (Bankr.D.Mass. 1989) ...............................................................8

*In re Public Service Company of New Hampshire*, 879 F.2d 987 (1st Cir. 1989) .................6-7

*In re Rancourt*, 123 B.R. 143 (Bankr.D.N.H. 1991) ..................................................7-8

*In re T.H.B. Corporation*, 85 B.R. 192 (Bankr.D.Mass 1988).......................................2, 5

*In re Triplett*, 87 B.R. 25 (Bankr.W.D.Texas 1988) ....................................................7-8

*In re Winthrop Old Farm Nurseries, Inc.*, 50 F.3d 72 (1st Cir. 1995) ............................1-3

*Matter of Earth Lite, Inc.*, 9 B.R. 440 (Bankr.M.D.Fla. 1981).............................................6

STATUTES AND RULES

11 U.S.C. §362 ....................................................................................................1

11 U.S.C. §362(d)(1) ..........................................................................................8

11 U.S.C. §363 ..............................................................................................1, 5, 6

11 U.S.C. §363(c)(2)...........................................................................................4

11 U.S.C. §364 ..................................................................................................1

11 U.S.C. §506 ..................................................................................................1

# I. INTRODUCTION

Appellant-Creditor, Bank Rhode Island ("Bank"), submits this reply brief in response to the arguments made by the Appellee-Debtor, Pawtuxet Valley Prescription & Surgical Center, Inc. ("Debtor"), in its responsive brief dated January 8, 2008 ("Debtor's Brief"), and in further support of the Bank's appeal from the Bankruptcy Court's Cash Collateral Order.[1]

# II. ARGUMENTS IN REPLY

## A. THE BANKRUPTCY COURT'S CASH COLLATERAL ORDER WAS CLEARLY ERRONEOUS ON THE GROUND THAT IT WAS BASED UPON THE FAIR MARKET VALUE OF THE SANDY BOTTOM PROPERTY RATHER THAN THE APPROPRIATE LIQUIDATION VALUE.

As anticipated, the Debtor argues that the Bankruptcy Court properly relied on the case of *In re Winthrop Old Farm Nurseries, Inc.*, 50 F.3d 72 (1st Cir. 1995), to support the application of the fair market value to the Property in this case. At the same time, the Debtor correctly acknowledges that *Winthrop* "did not directly address the issue of adequate protection" at all. Debtor's Brief at p. 14. That is exactly why the reasoning of *Winthrop* does not apply in the context of this 11 U.S.C. §363 cash collateral usage case. As explained in the Bank's Initial Brief at pp. 16-17, fair market value was applied by the *Winthrop* court in the context of a §506 determination of how to treat a secured lender's claim in a Chapter 11 plan of reorganization, *i.e.* what portion should be classified in the Chapter 11 plan as secured versus unsecured. The determination of value for purposes of confirmation of a Debtor's plan is completely distinct from valuation of real property in the context of a §362, §363 or §364 adequate protection

---

[1] All capitalized terms herein shall have the same meaning as defined in the Bank's initial opening brief filed with this District Court on December 14, 2007 ("Bank's Initial Brief").

analysis, all of which are typically before the Bankruptcy Court at the initial stage of a bankruptcy case. *See* cases cited in Bank's Initial Brief at pp. 15-17.[2]

Finally, Debtor cites *Winthrop* for the proposition that because it intends to retain the Sandy Bottom Property and continue to generate income through rentals, fair market value is appropriate in light of the Property's proposed use. *See* Debtor's Brief at p. 17. The Debtor's attempt to compare the present case with *Winthrop* ignores the fundamental element of "value" determination under the Bankruptcy Code, and is the principal cause of the Bankruptcy Court's erroneous holding in valuing the Property.

The term "value" is not defined under the Bankruptcy Code. Rather, as all courts have agreed, "value" is determined based upon the facts and circumstances presented by each case in which the "value" issue arises. As discussed in the Bank's Initial Brief at pp. 15-17, the facts and circumstances presented by each case require courts to consider what a secured creditor is likely to receive or realize from its collateral at the time that the value determination is being made.

At the cash collateral hearing, Debtor offered no evidence that the Bank was likely to realize fair market value from the Sandy Bottom Property. For example, Debtor offered no evidence that the Sandy Bottom Property was under a contract to be sold or even listed for sale with a real estate broker. It is quite understandable why no such evidence was proffered – Sandy Bottom has no intention or plan to sell the Property. In the absence of any evidence of a "likely"

[2] Debtor states that a case cited by the Bank, *In re T.H.B. Corporation*, 85 B.R. 192 (Bankr.D.Mass 1988), actually supports its argument that fair market value was the proper standard. *See* Debtor's Brief at p. 14, footnote 8. However, Debtor's statement is inaccurate and misleading because the proper valuation standard to be applied to real estate was never raised and challenged by the secured lender, or discussed by the bankruptcy court. The proper valuation issue that was addressed by the court in *T.H.B. Corporation* was in connection with the determination of a junior creditor's interest in the debtor's corporate/business assets only. *Id.* at 195-196.

sale: (a) the Bankruptcy Court was clearly erroneous in utilizing the fair market value of the Sandy Bottom Property in its cash collateral analysis; and (b) the Bankruptcy Court should have utilized the value that can be realized at the most likely sale event under the current facts and circumstances, *i.e.* liquidation value realized by a foreclosure sale.

The *Winthrop* court utilized this same "facts and circumstances" test. In *Winthrop*, the debtor proposed a Chapter 11 plan of reorganization where it would retain and continue to use its real estate. Notwithstanding its proposed retention, the debtor argued that the secured creditor's "secured claim" under the plan be limited to and based upon the liquidation value of the real estate. Utilizing the "facts and circumstances" test, the *Winthrop* court rejected debtor's argument. Because the debtor's plan proposed retention of the real estate, the *Winthrop* court easily concluded that the secured creditor was not likely to realize the liquidation value of its collateral – a foreclosure sale was precisely the event that the proposed plan sought to avoid. For purposes of determining the feasibility of the proposed plan, the *Winthrop* court concluded that the secured claim must be valued utilizing the "fair market value" of the collateral because that was the "likely" realization mandated by the proposed plan.

In its reliance upon *Winthrop*, Debtor attempts to create a simple equation, to wit "retention of property = fair market valuation." The Debtor's simple equation ignores the "facts and circumstances" test utilized by the *Winthrop* court. By advancing the *Winthrop* simple equation to the Bankruptcy Court in this matter, the Debtor led the Bankruptcy Court into its erroneous finding.

In conclusion, if liquidation values are uniformly assigned to the collateral assets securing the $2.5 million Indebtedness owed to the Bank,[3] there is **no equity cushion** and the

[3] As stated in Bank's Initial Brief, the Bankruptcy Court erroneously included the liquidation value of the Debtor's vehicles ($75,000) into the collateral asset calculation because the Bank does not have a priority

Bankruptcy Court should have analyzed the accuracy and stability of the Debtor's accounts receivable (*i.e.*, the Bank's cash collateral).[4] *See* Bank's Initial Brief at p. 18.

B. EVEN ASSUMING, *ARGUENDO*, THAT THE BANKUPTCY COURT'S VALUATION STANDARDS WERE PROPERLY APPLIED TO THE DEBTOR'S ASSETS AND AN "EQUITY CUSHION" EXISTS, THE BANKRUPTCY COURT'S CASH COLLATERAL ORDER WAS STILL ERRONEOUS IN ITS DETERMINATION THAT BECAUSE THE BANK HAD AN EQUITY CUSHION IN THE STATIC, HARD COLLATERAL ASSETS OF THE DEBTOR, IT WAS NOT NECESSARY FOR THE BANKRUPTCY COURT TO ADDRESS OR CONSIDER THE ISSUE OF THE FURTURE STABILITY OF THE SOFT ACCOUNTS RECEIVABLE COLLATERAL ASSETS.[5]

Contrary to the Debtor's assertion, the existence of an equity cushion is NOT in and of itself sufficient to provide adequate protection to a secured creditor where the issue is whether the debtor can continue to use its accounts receivable assets (Bank's cash collateral) post-petition

---

lien in those assets. On the other hand, the Debtor asserts that the Bankruptcy Court properly included the liquidation value of the Debtor's vehicles in its total collateral value determination because of the Bank's stipulated fact contained in the Joint Pretrial Order that "BankRI is the holder of a first position security interest in all of the assets of the Debtor, including its "Cash Collateral" as defined by §363(c)(2) of the U.S. Bankruptcy Code, pursuant to certain loan documents." JPO at §I, ¶7. It was undisputed that the Bank has a first position "blanket lien" on virtually all of Debtor's personal property and business assets. Of course, implicit in such a "blanket lien" are those exceptions under the Uniform Commercial Code, such as where there is a purchase money security interest which takes priority, like the vehicles in this case. Furthermore, the fact that the Bank's lien did not cover the vehicles was no surprise to the Debtor. Moreover, that fact was clearly pointed out to the Court by the Bank throughout the course of the hearing without any objection posed by the Debtor, and thus the Debtor has implicitly consented to the fact that the Bank does not have a priority interest in the vehicles. *See In re Byers*, 304 B.R. 1, 7 (1st Cir. BAP 2004).

[4] The Debtor inaccurately states that the Bank's examiner, Patricia Pothier, rendered or expressed an opinion regarding the overall value of the Debtor's collateral assets. *See* Debtor's Brief at p. 5. This could not be further from the truth. Ms. Porthier's job was to examine the books and records of PVP to confirm whether various information provided to the Bank from PVP (*e.g.*, borrowing base certificates) was accurate and reliable. She did not formally appraise anything, but rather merely recorded what she had observed from the Debtor's books and records or what she had been told by the Debtor as to value. Ms. Porthier ultimately concluded that the condition of the books and record were unsatisfactory. 9/21/07 Transcript at pp. 46-47, 49-50, 52-62, 65-66, 88-89. Finally, the Debtor can not rely on its Exhibit 4 as evidence of any collateral value for the reason that it was never admitted into evidence as a full exhibit. *See* Bank's initial Brief at p. 17.

[5] "Static" or "hard" assets "refers to assets that do not regenerate in the ordinary course and cycle of the business operations – such as realty, equipment, machinery and the like." *In re Dynaco Corporation*, 162 B.R. 389, 398, footnote 11 (Bankr.D.N.H. 1993). Whereas changing "soft" collateral refers to that which recycles from "raw materials into work-in process, into inventory, into receivables, into cash, into purchase of new raw materials." *Id.* at 394.

in a Chapter 11 case. The Bankruptcy Court and the Debtor believe that as long as there is an equity cushion in the Debtor's static, hard assets, the Debtor can use the accounts receivable assets as much as it wants to even if that means exhausting the receivables entirely. A close examination of the pertinent 11 U.S.C. §363 cash collateral cases cited by the Bank and the Debtor illustrates the fallacy of the Debtor's argument and the clear error made by the Bankruptcy Court.

In *T.H.B.*, the amount of the bank's debt was $800,000. The court valued the guarantor's residence and commercial real estate securing the debt at $819,000, in and of itself enough to provide a slim equity cushion. In addition, the court applied collateral values to the debtor's business assets. The court ultimately found that the value of the collateral far exceeded the debt. Nevertheless, despite the existence of an equity cushion in the real estate and other hard collateral assets alone, the bankruptcy court also analyzed the future stability of the debtor's accounts receivable in determining whether the bank was adequately protected. *Id.*, 85 B.R. at 195.

In the *Dynaco Corporation* case, the Bankruptcy court discussed an important distinction between static, hard collateral assets and cycling, soft collateral assets in the context of an adequate protection analysis under §363. The court stated that the "question of adequate protection of cycling, soft collateral presents unique considerations in the cash collateral usage context which do not necessarily raise the same concerns relevant to static assets that are not being 'used' in the business operation." *Id.*, 162 B.R. at 398. Therefore, even though the court found that there was an overall equity cushion of 17% over and above the secured debt of approximately $4,000,000, the court also analyzed whether the debtor could maintain a certain level of stability in its soft accounts receivable cash collateral. As the court stated:

> The crucial inquiry in the §363 context, and the purpose for which the adequate protection determinations are being made, is whether the debtor's ongoing operations [will] (sic) in fact keep the level of soft collateral essentially the same during the period prior to plan confirmation or denial of confirmation….

*Id.*, 162 B.R. at 397. The court further declared:

> The test with regard to usage of soft collateral is not whether the secured party took enough collateral of all kinds to protect itself prior to the bankruptcy, or more particularly whether it monitored carefully enough the level of its floating lien on soft collateral to protect itself, but rather whether what it actually *had* in terms of the level of its floating lien on its fluctuating collateral base will be preserved until a plan of reorganization is determined.

*Id.* at 398 (emphasis in original).

Finally, as stated by the court in the case of *Matter of Earth Lite, Inc.*, 9 B.R. 440, 443 (Bankr.M.D.Fla. 1981), Congress gave special treatment to "cash collateral" because it is highly volatile and subject to rapid deterioration, and thus requires special protective safeguards. The court <u>rejected</u> the debtor's argument that an equity cushion alone was sufficient adequate protection, and expressed the following sound rationale:

> …this Court is satisfied that the Debtor should not be permitted to use cash collateral without making some payments to the secured party just because it has, at the commencement of the case, a meaningful equity cushion in the collateral. To accept this proposition would mean that a debtor may freely use cash collateral until the collateral is reduced to the amount of the indebtedness during which time the secured party is deprived of income, for which it bargained when the loan was granted.

*Id.*, 9 B.R. at 444.

The other §363 cash collateral cases cited by the Debtor are distinguishable and lend no support for the Debtor's argument on this point. *In re Public Service Company of New Hampshire*, 879 F.2d 987 (1st Cir. 1989) involved an appeal where both the debtor and the secured lender <u>conceded the legal correctness</u> of the lower bankruptcy court's conclusion that the

bank had a sufficient equity cushion that would adequately protect any perfected security interest the bank had in the cash collateral. Thus, the issue of whether or not that bankruptcy court's decision was indeed legally correct was not before the appellate courts for review. A different ground was presented on appeal by the bank for review. Thus, this case sheds no light on the issue at hand in this case.

Similarly, the Debtor's case of *In re Triplett*, 87 B.R. 25 (Bankr.W.D.Texas 1988) is distinguishable from the circumstances of this case. In *Triplett*, the cash collateral was rent being generated from certain real estate that secured the bank's debt. The bank wanted to limit/restrict the debtor's use of the rents collected and sought adequate protection. The use of cash generated from accounts receivable assets was not at issue. The court found an equity cushion of $80,000 in the appraised hard collateral, and held that that use of the income generated by the real estate collateral (*i.e.*, the rent cash collateral) would not "impair" the creditor and deny the creditor adequate protection. *Id.*, 87 B.R. at 27. However, for the reasons set forth in a similar case, *In re Rancourt*, 123 B.R. 143 (Bankr.D.N.H. 1991), cases involving the debtor's use of cash collateral consisting of 'rents' are unique and distinguishable from other types of cash collateral that have no underlying source of protection (like cash generated from accounts receivable). The court in *Rancourt* determined that where the debtor has equity in the underlying real estate to cover the secured debt, the creditor is in no real danger if the debtor uses the rents generated therefrom. "This is true because rentals, uniquely among cash collateral categories, have the additional dimension of the real property mortgage... to safeguard the secured debt." The rents are directly tied and attached to the underlying real estate which secures and covers the debt. The underlying real estate was a stable, hard asset and was not going anywhere, so the source of the cash collateral (rents) would not be depleted without

recourse. Thus, the court found that the creditor was adequately protected without having to go into a stability analysis. *Id.*, 123 B.R. at 152-153. In contrast, unlike static real property, where the source of the cash collateral is accounts receivable, that source can be very unpredictable and volatile. For example, as cash is collected and used by the debtor, new accounts receivable must be generated by the debtor to replace the old collected receivables. There is no guarantee that this will happen. Thus, cash collateral generated from receivables require a certain level of stability because once the receivables are collected and the cash is used up, they're gone without any recourse to an underlying static collateral source. Thus, both *Triplett* and *Rancourt* are clearly distinguishable.[6]

Consequently, the Bankruptcy Court clearly erred in resting entirely on the equity cushion in PVP's static, hard assets and in failing to also examine the debtor's ability to maintain a stable level of cash collateral until a plan of reorganization is determined. Indeed, the overwhelming evidence established that the Debtor <u>cannot</u> maintain stability in the level of its accounts receivable during its attempt to reorganize, assuming *arguendo* that a reorganization is even possible. *See* Bank's Initial Brief at pp. 19-20.

---

[6] Other cases cited by the Debtor to support its equity cushion argument are <u>inapposite</u> because they do not even concern the issue of a debtor's continued post-petition use of cash collateral under §363. *See, e.g., In re Lane*, 108 B.R. 6 (Bankr.D.Mass. 1989) (§362(d)(1) relief from stay case dealt with whether to protect an existing equity cushion in real estate against future erosion due to continuing accruing interest on bank debt, real estate taxes and other expenses); *Baybank Middlesex v. Ralar Distributors, Inc.*, 69 F.3d 1200 (1st Cir. 1995) (Bank obtained relief from stay and foreclosed on all of debtor's assets, which paid all of pre-petition debt. Issue was whether bank was entitled to an administrative expense claim for post-petition accrued interest, attorneys' fees and costs which debtor was obligated to pay under loan agreements.); *In re Aegean Fare, Inc.*, 33 B.R. 745 (Bankr.D.Mass. 1983) (Commonwealth of Massachusetts seized debtor's restaurant properties due to unpaid sales taxes. Debtor filed Chapter 11 petition the next day and a motion to compel turnover of the properties to the bankruptcy estate. Thus, clearly did not involve the use of cash collateral or a secured creditor's interest therein.).

## III. CONCLUSION

Based upon all of the reasons set forth in the Bank's Initial Brief and above, the Bank respectfully requests that this Court reverse and vacate the Cash Collateral Order entered by the Bankruptcy Court.

Respectfully submitted,

BANK RHODE ISLAND
By its Attorneys,

/s/ Denean M. Russo
Robert D. Wieck, Esq. #1739
Attorney Denean M. Russo #5043
MacAdams Wieck DeLuca & Gemma Inc.
101 Dyer Street, Suite 400
Providence, Rhode Island 02903
(401) 454-8700
(401) 454-8755 (facsimile)
Dated: January 22, 2008

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the within Appellant's Reply Brief was served by electronic mail through the Federal District Court's Electronic Case Filing system on the 22nd day of January, 2008, to the following counsel:

Andrew S. Richardson, Esq.
Steven J. Boyajian, Esq.
Boyajian Harrington & Richardson
andy@bhrlaw.com
steve@bhrlaw.com

Leonard J. DePasquale, Esq.
Assistant United States Trustee
ustpregion01.pr.ecf@usdoj.gov

Joseph P. Ferrucci, Esq.
Ferrucci Russo P.C.
jferrucci@frlawri.com

I hereby certify that on this 22nd day of January, 2008, a true copy of the within Appellant's Reply Brief was forwarded via first class mail, postage prepaid, to the following:

Attorney Carol Ann Slocum
Klehr Harrison Harvey Branzburg & Ellers
457 Haddonfield Road, Suite 510
Cherry Hill, NJ 08002-2220

/s/ Denean M. Russo

G:\Bank Rhode Island\Pawtuxet Valley Prescription & Surgical Center, Inc\Bankruptcy Pleadings\Appellants' Reply Brief 0108.doc